IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

02 MAY 20 P... ...

... ......... .....
N.D. OF ALABAMA

GREENBRIAR VILLAGE, L.L.C.,    }

      Plaintiff,       }

v.          }      CASE NO. CV-01-BE-3066-S

CITY OF MOUNTAIN BROOK,     }

      Defendant.      }

**ENTERED** ℘↺

**MAY 20 2002**

## MEMORANDUM OPINION

This case came before the court for a non-jury trial on the merits, consolidated with the Plaintiffs' request for a preliminary injunction, on January 15-16, 2002. After two days of testimony, the court allowed the parties to submit additional evidence by deposition excerpts, and to submit their arguments through briefs. On March 18, 2002, the court held a conference with counsel and parties in an unsuccessful effort to resolve the case. Subsequent to the conference, defense counsel requested and was granted the opportunity to file a supplemental brief. Having considered all evidence and arguments offered at trial and in subsequent submissions, including supplemental post-trial briefs, the court enters its findings of fact and conclusions of law.

### I.    Procedural History

Greenbriar Village, L.L.C. sued the City of Mountain Brook, pursuant to 42 U.S.C § 1983, challenging the constitutionality of three city ordinances, "as well as [the City's] failure to provide adequate legal process under the law, and [the City's] pattern and practice of singling out [Greenbriar] through the passage of numerous ordinances that are arbitrary, capricious and

36

unsupported by any rational basis." (Compl. p. 1).  Greenbriar seeks declaratory and injunctive

relief for violations of substantive due process,  procedural due process, and equal protection

under the Unites States Constitution.  (Compl. pp. 16-19).  Greenbriar asserts that the cumulative

effect of Ordinance Numbers 1224, 1356, 1357, 1396, 1459, 1485, and 1496 violates substantive

due process, (Compl. pp. 16-17), and also that Ordinance Numbers 1396,[1] 1459,[2] and 1485[3]

---

[1]Ordinance Number 1396 reads, in pertinent part: "the Local Business District designation is intended to be
applied only to areas within and contiguous to [Crestline, English, and Mountain Brook] villages and to other
commercial areas whose design would emulate the villages' approach to development."  Further, Ordinance Number
1396 provides that:

    **Conditional Uses.**  The following uses may be permitted in a Local Business District, but only
    with the prior written approval of the Planning Commission. . . . (b) Automobile service stations
    and stores at which gasoline is sold, regardless of whether or not repair services are provided at
    such stores, including, without limitation, stores at which groceries . . . (c) Repair garages,
    provided that all work is done wholly within a building, and that there is no storage or parking of
    wrecked cars on the premises . . . . (emphasis in original).

[2]Ordinance Number 1459, in pertinent part, reads:
(b) If the City Council denies an application for a change in the zoning classification of a parcel,
another application for the same change in the zoning classification of the parcel, or any part of
such parcel, shall not be considered by the Planning Commission or the City Council until two (2)
years have elapsed from the date on which the application is denied by the City Council or, if the
application is withdrawn, by the applicant prior to the City Council making a decision with respect
to such application, but after the Planning Commission made a recommendation to the City
Council with respect to such application, until two (2) years have elapsed from the date on which
the Planning Commission made its recommendation . . . (d)Notwithstanding the provisions of
subsection (b) above, if the decision of the City Council to deny an application for a change in the
zoning classification of a parcel is challenged in the Circuit Court and if the final judicial
termination is that such application will not be granted, regardless of whether such decision is
made by the Circuit Court or by an appellate court to which the decision of the Circuit Court is
appealed, another application for the same change in the zoning classification of the parcel, or any
part of such parcel, shall not be considered by the Planning Commission or the City Council until
five (5) years have elapsed from: (i) the date on which the decision or order of the court, whether it
be the Circuit Court or an appellate court, is final and the time for appeal, or further appeal, has
expired; or (ii) the date on which such legal proceeding is dismissed if it is dismissed prior to a
final judicial determination being made with respect to such application.

[3]Ordinance Number 1485, in pertinent part, reads:
(b) . . . it shall be unlawful to commence or continue to conduct, or for the owner to allow the
commencement or conduct of, any land-disturbing activity in anticipation of using a site for a
purpose that would violate the provisions of Chapter 19 (Zoning) of this Code . . . .
(k) All permits issued under this Article prior to July 12, 1999 (the effective date of the Soil
Erosion and Sediment Control Ordinance of the City of Mountain Brook), shall expire within thirty
(30) days of the effective date hereof.  The official shall give notice of such expiration to all
holders of such permits within ten  (10) days of the effective date hereof . . . .

violate substantive due process, procedural due process, and equal protection, both facially and as applied to Greenbriar. (Compl. pp. 17-19).

Along with its complaint, Greenbriar filed an Emergency Motion to Set Hearing on its request for preliminary injunctive relief. (Doc. 2). Pursuant to Federal Rule of Civil Procedure 65(a)(2), and after discussions with counsel, this court held a consolidated preliminary injunction hearing with an advanced trial on the merits on January 15-16, 2002. At the court's request, the parties submitted initial legal briefs (Docs. 7, 8), as well as pretrial briefs addressing the issue of justiciability of the plaintiff's claims (Docs. 10, 11). After these numerous pretrial briefs and two days of testimony, this court dismissed the constitutional challenges to Ordinance Numbers 1396 and 1459 as not being ripe for adjudication for the reasons stated on the record. (Tr. pp. 352-53, 367). The plaintiff has made no requests under those ordinances, and the City has taken no action adverse to Greenbriar under those ordinances. Accordingly, the claims as to those ordinances are not yet ripe for adjudication. See, e.g., Pittman v. Cole, 267 F.3d 1269,1282 (11th Cir. 2001) (setting forth general standards for justiciability, particularly the requirement of an injury in fact that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical").

The issue of ripeness plays a crucial role in the court's subject matter jurisdiction over this case. In Greenbriar, Ltd. v. City of Alabaster, the Eleventh Circuit noted that "ripeness goes to whether the district court has subject matter jurisdiction to hear the case." 881 F.2d 1570, 1574 (11th Cir. 1989). Further, the Eleventh Circuit stressed the importance of determining ripeness prior to any analysis of the merits of zoning ordinances and regulations. Id. at 1573-75 (stating that "before addressing the substantive merits of the City's claim, we must consider

3

whether the City's rejection of Greenbriar's rezoning plan was final"). Because the plaintiff's challenges to Ordinance Numbers 1396 and 1459 are not ripe, and, therefore, were dismissed, the only claims remaining for adjudication are substantive due process, procedural due process, and equal protection challenges to Ordinance Number 1485.[4]

At the outset, the court notes that Greenbriar has repeatedly failed in efforts to have the property rezoned and, in the process, has left behind a trail of litigation concerning the property. Indeed, Judge Vowell's decision in *Greenbriar Village, L.L.C. v. City of Mountain Brook*, Case Number CV-00-3720-JSV, which involved a challenge to the City's denial of a rezoning request by Greenbriar for the construction of a Walgreens store, was recently affirmed on appeal to the Alabama Court of Civil Appeals. *Greenbriar Village, L.L.C. v. City of Mountain Brook*, ___ So. 2d ___, 2002 Ala. Civ. App. Lexis 332 (April 26, 2002) (affirmed without opinion). In his opinion, Judge Vowell noted the repeated litigation regarding the Greenbriar property: "[t]his case is not the first one involving this piece of property or even this land disturbance permit." Although the issue of rezoning is not before this court, the history of this property has been litigious, requiring an extensive explanation of the facts.

**I.      Findings of Fact**

Greenbriar owns the property at the intersection of Green Valley Road and U.S. Highway 280 in the city of Mountain Brook, Alabama. (Saiia Aff. ¶¶ 2, 4). The property is a combination of three parcels. (Pl.'s Ex. 14). The acquisition of this ten-acre plot began in 1990 and initially

---

[4]Because only claims related to Ordinance 1485 remain, the court declines to evaluate Greenbriar's assertions regarding the cumulative effect of the several ordinances listed above. Both parties have abandoned this issue, as none of the post-trial briefs referenced this claim. *See* Greenbriar's Post Trial Submittal at Introduction ("In light of this Court's bench ruling at trial, the only remaining claims are Greenbriar's challenges to Ordinance No. 1485.").

involved Jody Saiia and John De Buys as principals. (Tr. p. 221). Greenbriar currently is owned by Charles McPherson, a family partnership involving Joseph Saiia, and a family partnership involving John F. De Buys, Jr. (Tr. pp. 220-21).

At the time of the initial purchase, the purchasers knew that the property was zoned residential. (Tr. p. 221). In 1990, the zoning classification of the property was Estate Residential District, which has a minimum lot size of two acres. (Pl.'s Ex. 23). The property remained zoned Estate Residential until April 9, 2001, at which time the property was rezoned to Cluster Residential by unilateral action of the City. (Pl.'s Ex. 29). In short, at all times since its purchase, the property has been zoned for residential, not commercial use. Greenbriar admits that it knew the property was zoned residential at the time it was purchased, and that Greenbriar might never have the right to build anything other than residential structures on the property, although it has repeatedly asserted that the property is not suited for residential development. (*See, e.g.*, Tr. pp. 221-25).

In 1992, Greenbriar applied for and was denied rezoning of the property for an office development. (Ex. B to Saiia Aff.). At that time, Greenbriar representatives met with Bob Doody and Bill Matthews, both City officials, and had a hearing before the City Council, where City officials suggested that Greenbriar reapply for a zoning change when Highway 280 was changed to six lanes.[5] (Tr. pp. 300-01).

The City adopted its first Master Plan in March 1994, which contained a suggestion that zoning of the plaintiff's property be changed from Estate to Cluster Residential. (Tr. pp. 101-

---

[5]The court, whose judge regularly travels Highway 280, takes judicial notice that the highway was widened to six lanes several years ago.

5

02).  On May 19, 1997, Greenbriar filed a request for rezoning to Local Business District for "Greenbriar Village," which included retail stores, a grocery store, and an automobile service station.  (Ex. B to Saiia Aff.; Pl.'s Ex. 12; Pl.'s Ex. 13, Tr. p. 40).

On December 5, 1997, Greenbriar received a National Pollutant Discharge Elimination System (NPDES) General Stormwater Permit from the Alabama Department of Environmental Management.  (Pl.'s Ex. 42).

At a meeting before the City Council on December 8, 1997, the City Council denied the Local Business District rezoning request for "Greenbriar Village."  (Ex. B to Saiia Aff.).  Greenbriar challenged this decision in the Circuit Court of Jefferson County.  (Saiia Aff. ¶ 13).  Greenbriar lost in the Circuit Court and appealed this decision.  Greenbriar later dropped this appeal because of an inadequate transcript of the trial. (Ex. B to Saiia Aff.).

On February 17, 1998, Greenbriar submitted an application for a land disturbance permit to the City.  (Pl.'s Ex. 2).  The application listed Greenbriar Village, L.L.C. as the applicant, with an address of 420 North 20th Street, Suite 3100, Birmingham, Alabama 35203, the business address of John De Buys.  *See id.*  The application contained a clause, signed by Mr. Saiia, that pledged his responsibility for complying with the Erosion and Sediment Control Ordinance and Program of the City.  *Id.*  The City issued the permit to Greenbriar as the owner or authorized agent on March 18, 1998.  (Pl.'s Ex. 1). The permit named BEC/Allwaste, Inc. as the contractor and listed "clearing twenty [sic] acre commercial site" as the description of the work to be done.  *Id.*  The bond amount on the original application was $10,000, (Pl.'s Ex. 2), but this amount was

later increased in accordance with Judge Vowell's order.  (Tr. pp. 150-51).[6]

Greenbriar knew when it applied for the land disturbance permit that it did not have the zoning right to construct anything commercial.  (Tr. pp. 204, 224).  Nevertheless, Greenbriar applied for the land disturbance permit pending an appeal of the City's latest denial of Greenbriar's attempt to rezone. (Tr. p. 233).

When Mr. Galloway, the City attorney at that time, originally reviewed Greenbriar's land disturbance application submitted in February 1998, he wrote Mr. De Buys that it was unusual for someone to apply for such a permit when the property was not zoned for the use to which the owners wish to put it, but he could find no reason not to issue the permit if the applicants otherwise met the requirements.  (Pl.'s Ex. 3).  In his letter,  Mr. Galloway also reminded the owners of Greenbriar that the issuance of the land disturbance permit would not enable Greenbriar to construct any improvements other than those that were permitted under the current zoning ordinance. *Id.*

The clear language of the permit issued to Greenbriar contains no expiration date.  (Pl.'s Ex. 1).  The court specifically finds that the City issued the land disturbance permit with knowledge that Greenbriar did not intend to use the property for residential use and that the permit had no expiration date.

Immediately following the issuance of the permit, Greenbriar began cleaning up the property where people had dumped trash, swings, shingles, and tires.  (Tr. pp. 261-62).  Months

---

[6]At trial, neither party produced definitive proof of the number of times the bond amount has been increased.  Apparently, the bond amount was increased to $30,000 in November of 2000.  (Def.'s Ex. 7).  Subsequently, Judge Vowell ordered Greenbriar to pay all fees and bonds required within 5 days as a part of his January 22, 2001 ruling.  Both parties agree that Greenbriar complied with this order.  The exact amount of the bond paid remains unclear in the record.

later, Greenbriar also began clearing and earth movement pursuant to the permit on the portion of the property next to Highway 280. (Tr. pp. 261-63).

On March 22, 1999, Greenbriar filed a second request for rezoning to Local Business District, proposing a Walgreens Pharmacy on a portion of the property. (Tr. p. 202). Between March 22, 1999 and October 25, 1999, the date on which the City Council denied the Walgreens application, Greenebriar did a substantial amount of clearing and grading on the property. (Tr. p. 203). On June 20, 2000, Greenbriar challenged the denial of the Walgreens rezoning request in the Circuit Court of Jefferson County, Alabama. (Saiia Aff. ¶ 38).

While the Walgreen's challenge was pending in the Circuit Court, several significant events occurred. On November 13, 2000, the City Council on its own  initiated rezoning of the property from Estate to Cluster Residential. (Pl.'s Ex. 28). The City passed the ordinance rezoning the property one week before the trial of the Walgreens zoning challenge commenced. (Pl.'s Ex. 29).

Also in November 2000, the City issued a stop-work order to Greenbriar, requiring Greenbriar to halt work under its Land Disturbance Permit. (Tr. p. 74). After the City issued the stop-work order, Greenbriar filed a writ of mandamus in the Circuit Court for Jefferson County. Judge Vowell granted an expedited hearing, which was held on January 3, 2001. (Pl.'s Ex. 46, *Greenbriar Village, L.L.C. v. City of Mountain Brook,* Case No. CV-00-3720-JSV). The court found that "[t]he scope of the work contained in the original application and the [Land Disturbance] permit includes the filling and grading work that has been done by the plaintiff, its contractors or subcontractors." *Id.* Judge Vowell issued an order which stated, in part, "that the City of Mountain Brook is hereby ordered and directed to rescind all stop-work orders in

8

conjunction with land disturbance or clearing of the land owned by the Plaintiff which is the subject of the litigation." *Id.* The court ordered that any and all additional fees or bonds that were required should be paid by Greenbriar within five days of notice from the City administrator. *Id.* Thereafter, Greenbriar paid its revised fee, its Land Disturbance Permit was reinstated, and it resumed work. (Tr. p. 150). The City appealed this decision to the Alabama Court of Civil Appeals, (Ex. B to Saiia Aff.), which was also affirmed in *Greenbriar Village, L.L.C. v. City of Mountain Brook*, ___ So. 2d ___, 2002 Ala. Civ. App. Lexis 332 (April 26, 2002) (affirmed without opinion).

From 1996 to the present, several zoning ordinances have been revised. (Pl.'s Ex. 23). Chapter 19 of the City Code regulates zoning. (Tr. pp. 35, 36). Ordinance Number 1224 amended this chapter in its entirety on February 26, 1996. That ordinance also eliminated the Neighborhood Business District Zoning Classification and amended the Local Business District Zoning Classification to make an "automobile service station" a conditional use rather than a permitted use. (Galloway Dep. p. 98). After the passage of Ordinance 1224, the only zoning category that permitted an automobile service station was the Local Business District. (Tr. p. 39). On May 10, 1999, the City adopted Ordinance Number 1356, which amended the conditional use under the Local Business District classification by adding a provision that included as a conditional use "stores at which gasoline is sold, regardless of whether or not repair services are provided at such stores." (Pl.'s Ex. 24). Greenbriar has presented at least two plans to the City that included gas stations on its property. On January 10, 2000, the City passed Ordinance Number 1396, which provided that "the Local Business District designation is intended to be applied only to areas within and contiguous to those villages and to other

9

commercial areas whose design would emulate the villages' approach to development." (Pl.'s Ex. 22).

The City has also amended its zoning regulations regarding the time delay required between the denial of a rezoning application and a reapplication. On May 10, 1999, the City passed Ordinance Number 1357, which mandated a one-year waiting period before reapplication for rezoning of the same parcel if an appeal is made to the Circuit Court. (Pl.'s Ex. 25). Subsequently, on February 12, 2001, the City passed Ordinance Number 1459, further amending the reapplication requirements and procedures to extend the time delay between an unchallenged denial and a reapplication to two years; to extend the time delay to five years following an unsuccessful challenge in the Circuit Court; and to make the reapplication delay applicable to any part of the parcel. (Pl.'s Ex. 26). Although Greenbriar originally challenged these ordinances in this action, the court dismissed these challenges at trial because Greenbriar had taken no action under these ordinances, nor had the City applied those ordinances against Greenbriar. Therefore, the court found that the claims were not ripe for adjudication.

In the Code revision pertinent to this case, the City added an ordinance related to land disturbance permits, Ordinance Number 1485, which was passed on September 10, 2001. Ordinance 1485 provided changes to Article IV of Chapter 4. (Def.'s Ex. 8).[7]

Ordinance 1485, in short, makes it unlawful to commence or continue to conduct any land disturbing activity in anticipation of using a site in a way that would violate the provisions

---

[7]Historically, Chapter 4, entitled BUILDINGS AND BUILDING REGULATIONS, contained a subsection, Article IV, which between 1991 and 1999 dealt with "Land-Disturbing Activities." (Pl.'s Ex. 7). The title of Article IV changed to "Soil Erosion and Sedimentation Control" after the passage of Ordinance Number 1377, which amended the aforementioned "Land-Disturbing Activities" subsection. (*See* Pl.'s Ex. 6).

of the zoning chapter.  Ordinance 1485 requires all landowners who conduct land disturbing activity to be in conformity with the use allowed under the current zoning.  Further, the Ordinance, in subsection (k), provided that permits issued prior to July 12, 1999 would expire thirty days after its effective date.  The Ordinance also provided that a newly-issued permit will expire, at most, twenty-four months from the date of issue; that the permit will be terminated if work is suspended or abandoned; and that work is presumed to be suspended or abandoned if no work is done for fourteen consecutive days.  (Def.'s Ex. 8).  Finally, the Ordinance contained no grandfather clause for previously-issued permits.  *Id.*   A previous ordinance that modified the land disturbance ordinance, Ordinance Number 1377, did contain such a grandfather provision. (Tr. p. 118).

The court specifically finds that Greenbriar's unusual request for a land disturbance permit for activity in anticipation of putting the property to a use for which it was not then zoned demonstrated to the City the need for revision of the current ordinances.  The City admitted that Ordinance Number 1485 "was prompted in part, but only in part, by concerns surrounding activities on the U. S. 280 site" in a November 20, 2001, letter to Mr. De Buys from the City's attorney at that time, Carl Johnson.  (Pl.'s Ex. 41, emphasis added).  However, Mr. Johnson's letter to Mr. De Buys regarding Ordinance 1485 stressed that "[t]he amendment was approved for the sole purpose of strengthening the ordinance." (Pl.'s Ex. 41).

According to Mr. Greg Doody, the attorney who drafted Ordinance 1485 for the City, he submitted the first draft of 1485 to the City in May or June of 2001.  (Tr. p. 386).  Mr. Doody was one of the lawyers defending the circuit court challenge by Greenbriar to the City's denial of Greenbriar's Walgreens rezoning application at the time he drafted Ordinance 1485.  (Tr. p. 370).

11

Mr. Doody initiated the drafting of 1485 to "address ambiguities and [for] clarification" of the City's prior ordinances. (Tr. pp. 370, 371). The City Council and the Mayor discussed the Ordinance in closed-door sessions between May or June of 2001 and August of 2001. (Tr. pp. 386, 387).

The court specifically finds that Ordinance 1485 targeted Greenbriar and that the City designed Ordinance 1485 to accomplish what its stop-work order could not do – force Greenbriar to cease its work on its property under its existing validpermit. Because the City could not make Greenbriar discontinue the stockpiling under the terms of Judge Vowell's order, the court finds that the City enacted Ordinance Number 1485, which caused the validly-issued permit to expire.

Although Mr. Doody could not recall any specific details, he did testify that persons present at those meetings discussed whether the City would notify the landowners affected by the Ordinance. (Tr. p. 395). By a letter dated August 30, 2001, the City sent notice to Saiia Construction[8] and seven other contractors that Ordinance Number 1485, which amended the Soil and Erosion Control Ordinance, was read by the City Council on August 27, 2001, and that it would be considered for adoption on September 10, 2001. (Pl.'s Ex. 39). The last page of Plaintiff's Exhibit 39, a collection of letters notifying companies (including Saiia Construction) of the City Council's upcoming consideration of Ordinance 1485, is a copy of an e-mail from Vicki Thomas, a City worker, listing the contractors currently holding Land Disturbing/Soil Erosion permits. It reads: "[i]f you are going to send mail to the owners, let me know because I

---

[8]Saiia Construction was not the entity listed as the contractor on the land disturbing permit. (Pl.'s Ex. 1). Saiia Construction, LLC was named as the principal on the increased bond signed in November 2002. (Def.'s Ex. 7). Notably, this bond did not contain the address for Saiia Construction. *Id.* Thus, the only address known to the City at all pertinent times was that of Greenbriar Village, L.L.C., *not* Saiia Construction.

will need to research their zip codes." (Pl.'s Ex. 39; Tr. p. 82).  Apparently, no one requested

those zip codes because the City did not send notice to owners of the affected properties.

With the exception of Greenbriar, all of the permits affected by Ordinance 1485 were

completed within the thirty days provided in the Ordinance before expiration.  (Weems Dep. pp.

23-31).  The court finds that, had the holders of these other permits not been able to complete the

work within the thirty days allowed, these other permit holders would have been able to request

and receive renewal of their permits under the new ordinance  because the work on the other

properties was "in anticipation of" a use allowed under the current zoning of those properties.

Conversely, the court finds that Greenbriar was the only property owner that could not renew its

permit under these same terms, as Greenbriar's work was not "in anticipation of" a use allowed

under the property's current residential zoning; therefore, the renewal request could not meet the

requirements of Ordinance 1485.

Prior to the August 30, 2001, letter sent to Saiia Construction regarding the Greenbriar

property, all notices and correspondence regarding Greenbriar had been sent to Mr. John De Buys

at 420 North 20th Street, Suite 3100.  (Pl.'s Exs. 3, 20, and 40).  The notice of rezoning of the

property was sent to John F. De Buys at 420 N. 20th Street, 3100 SouthTrust Tower.  (Pl.'s Ex.

31).  After the passage of the Ordinance, the City sent notice to Greenbriar on November 2, 2001

as follows: "Greenbriar Village, L.L.C., Attn: Mr. Joseph Saiia, in care of Mr. John F. De Buys,

Jr., Burr & Forman, 3100 SouthTrust Tower, 420 N. 20th Street, Birmingham, Alabama 35203."

(Pl.'s Ex. 43).  The court finds that the City knew how to contact the owners of Greenbriar when

it desired to do so.  The evidence leads the court to conclude that the City specifically chose not

to send notice to Greenbriar of the proposed ordinance by the means customarily used.

The City advised Greenbriar by a letter dated November 2, 2001, sent to Mr. De Buys that its Land Disturbance Permit had expired and that enforcement of Ordinance 1485 would be deferred until December 1, 2001. (Pl.'s Ex. 43). Mr. De Buys, on behalf of Greenbriar, told City representatives that Greenbriar was being unfairly targeted and requested information on those who were treated similarly. (Saiia Aff. ¶ 30). In response, an attorney for the City sent a letter dated November 20, 2001 that identified permit holders affected by the Ordinance. (Pl.'s Ex. 41). That letter also acknowledged that Greenbriar's activities were "in part" the motivation for the ordinance. *Id.*

Upon receiving notice that Greenbriar was given until December 1, 2001, to stop work, Saiia Construction shut down the job. (Saiia Aff. ¶ 30). No work was done after December 1, 2001, except for emergency environmental work performed by Saiia Construction employees, without the permission of Greenbriar or Mr. Saiia, after heavy rains on December 19, 20, 21, and 26. Because the work took place after the expiration of the permit, City officials inquired about this work. (Tr. p. 214). At the time of the work stoppage, the plaintiff had stockpiled on the property approximately 60,000 cubic yards of fill material. (Tr. p. 267).

Prior to the work stoppage in November, Greenbriar had separate arrangements with third parties to receive free or reduced-cost fill materials, all of which have been eliminated by the revocation of its permit. At the present time, no provision in the City Code would allow Greenbriar to shape, level, remove erosion control pieces, or eliminate terracing, except to abate a nuisance. (Tr. pp. 344-47).

As noted above, Greenbriar sought and obtained a NPDES General Stormwater Permit on December 5, 1997. This permit, which is issued and monitored for compliance by the Alabama

Department of Environmental Management (ADEM), requires the holder to follow certain specified guidelines to reduce and/or eliminate water runoff. These obligations will continue until July 31, 2002, the expiration date of the NPDES permit, even though Greenbriar is not allowed to do the necessary work on its property to meet those obligations without the City's permission. The City argues that Greenbriar would be allowed to continue work under the NPDES permit regardless of the status of its land disturbance permit on the alternative theories that (1) the City Code always allows work to correct a nuisance and (2) that the federal permit would preempt any city ordinance to the contrary. (City's Post Trial Brief pp. 8-11). Mr. Weems, the City official who would enforce Ordinance 1485, testified that the City Code allows landowners to correct nuisances without a land disturbance permit. (Tr. pp. 346-47). However, Mr. Weems further testified at trial that, unless Greenbriar obtains a new permit, no provision in the City Code would allow Greenbriar to level, grade, or use machinery to haul out erosion control, or take other steps, all of which may be required to comply with the NPDES/ADEM permit. (Tr. p. 345). The court notes that Ordinance 1485 and the NPDES permit create potentially inconsistent obligations for Greenbriar.

The court expressly finds that the City adopted Ordinance 1485 to address the problems it perceived resulting from Greenbriar's permit; that the termination of Greenbriar's permit motivated the enactment of Ordinance 1485(k); that the City knew and intended that Ordinance 1485(k) would permanently revoke Greenbriar's land disturbance permit and that no other landowner's permit would be similarly affected; that the City could have given notice to Greenbriar prior to the passage of Ordinance 1485, but chose not to do so; and that Greenbriar cannot comply with its obligations under the NPDES/ADEM permit because of the revocation of

15

its land disturbance permit.

## III. Conclusions of Law

### A. GENERAL PRINCIPLES

The plaintiff asserts causes of action stemming from the Fourteenth Amendment of the United States Constitution, which reads: "No state shall . . . deprive any person of life, liberty, or property, without due process of law . . . ." U.S. Const. amend. XIV § 1.   This clause provides two distinct guarantees: substantive due process and procedural due process. *Zinermon v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 983, 108 L. Ed. 2d 100 (1990).  Plaintiff asserts that the City of Mountain Brook denied it procedural due process by ineffective notice of the ordinance that, in effect, permanently revoked its land disturbance permit, and that the City violated substantive due process by targeting it by the revisions to the Code and by acting arbitrarily and capriciously in enacting Ordinance Number 1485.  The plaintiff also asserts that the City violated equal protection, both facially and as applied to Greenbriar, by enacting Ordinance 1485, which Greenbriar asserts created a "class of one" that has been singled out for selective treatment and serves no rational basis.  To redress these alleged constitutional violations, the plaintiff sought injunctive protection.

The Eleventh Circuit requires that the plaintiff show three elements to obtain permanent injunctive relief: (1) establish the existence of a constitutional violation; (2) demonstrate that continuing irreparable injury will result if the injunction is not issued; and (3) prove the lack of an adequate remedy at law. *See Newman v. State of Alabama*, 683 F.2d 1312, 1319 (11th Cir. 1982).

This court is mindful that it should exercise basic caution in evaluating city ordinances.

16

*See Joel v. City of Orlando*, 232 F.3d 1353, 1358 (11th Cir. 2000). This caution is particularly true in analyzing zoning decisions. The Eleventh Circuit has stated: "[w]e stress that federal courts do not sit as zoning boards of review and should be most circumspect in determining that constitutional rights are violated in quarrels over zoning decisions." *Spence v. Zimmerman*, 873 F.2d 256, 262 (11th Cir. 1989) (citations omitted); *see also Hynes v. Pasco County, Fla.*, 801 F.2d 1269, 1269 (11th Cir. 1986) ("The federal courts will not sit as a zoning review board."). Although the question before this court is not the zoning of this property, the court finds these cautions equally applicable to the challenge to the ordinance that addresses the land disturbance permit because that ordinance is part of the land use scheme of the City.

## B. Substantive Due Process

The Eleventh Circuit outlined the two-part test for substantive due process as it relates to the deprivation of a property interest:

> A substantive due process analysis, within the deprivation of a property interest context, involves two queries. Greenbriar, Ltd. v. City of Alabaster, 881 F.2d 1570, 1577 (11th Cir. 1989). First, was the plaintiff deprived of a constitutionally protectable property interest? *Id*. Second, assuming a property interest, was the deprivation of that 'property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and . . . without any rational basis [?]' Hearn v. City of Gainesville, 688 F.2d 1328, 1332 (11th Cir. 1982).

*The Reserve, LTD. v. Town of Longboat Key*, 17 F.3d 1374, 1379 (11th Cir. 1994). The court must follow this two-step analysis in evaluating Greenbriar's claims.

### 1. Property right

The first question, then, is whether Greenbriar has a property interest in the land disturbance permit. "'Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem

17

from an independent source such as state laws – rules or understandings that secure certain benefits and that support certain claims or entitlement to those benefits.' Board of Regents v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972)." *The Reserve*, 17 F.3d at 1379.

In this case, the court must look to Alabama law to determine whether the plaintiff has any vested property rights that were affected by Ordinance 1485 because "land use rights, as property rights generally, are state created rights." *DeKalb Stone, Inc. v. County of DeKalb, Ga.,* 106 F.3d 956, 959 (11th Cir. 1997).

The plaintiff asserts that it has four vested property rights that have been violated by Ordinance 1485. First, Greenbriar claims that it has a vested property interest in the land disturbance permit because the code section governing the issuance of the permit at the time of its application did not give any discretion to the City but mandated issuance if the applicant met statutory requirements. (Greenbriar's Post Trial Submittal, p. 2). Section 4-43, Ch. 4, Mountain Brook City Code, at the time Greenbriar applied for the land disturbance permit, read:

> *If the administrator is satisfied* that the work described in an application for permit and the plans and specifications conform to the requirements of this and other pertinent laws and ordinances, that the fees have been paid and the necessary bonds obtained, he *shall issue* a permit to the owner. (Emphasis added.)

Greenbriar relies on the mandatory word "shall" in the last phrase to argue that the language of the section leaves no discretion to the City official regarding the issuance of the permit. However, the plaintiff ignores the preliminary requirement that the administrator must first be satisfied that the applicant meets various requirements. Providing that the administrator be "satisfied" and stating that the permit "shall issue" only "IF the administrator is satisfied" leaves

18

discretion to the issuing official.  Further, even if no discretion existed regarding the *issuance* of

the land disturbance permit,  the plaintiff's reliance on this provision does not support its

argument that it had a vested interest in the *continuation* of the permit.

Although Greenbriar also asserts that its property rights spring from the issuance to it of a

NPDES Permit and because of its inherent "bundle of property rights," (*see* Pl.'s Initial Br. pp. 3-

4; Pl.'s Post Trial Submittal, pp. 3-6), this court finds that the most solid basis for Greenbriar's

vested property rights under applicable Alabama law rests in the doctrine of equitable estoppel.

Under Alabama law, the validity of an amendment to a zoning ordinance "must stand or fall on

vested rights, which, in the absence of contract, depend for their existence on equitable fairness,

both to the property owner and to the general public." *Grayson v. City of Birmingham*, 173 So.

2d 67, 69 (Ala. 1963).  This Alabama law comports with the general rule that

> [a] landowner will be held to have acquired a vested right to continue and
> complete construction of a building or a structure, and to initiate and *continue a*
> *use*, despite a restriction contained in an ordinance or an *amendment thereof*
> where, *prior to the effective date of the legislation and in reliance upon a permit*
> *validly issued*, he has, in *good faith*, (1) made a substantial change of position in
> relation to the land, (2) made substantial expenditures, or (3) incurred substantial
> obligations.

Edward H. Zeigler, 4 Rathkopf's Law of Zoning & Planning § 50.04[3][a](emphasis added).

In March 1998, Greenbriar received its land disturbance permit, and in reliance upon the

authority it granted, began clearing, grading, and bringing in fill material to its property.  The

permit did not contain any expiration date.  Had Greenbriar known in 1998 that its permit would

expire on December 1, 2001, it could have planned accordingly to finish the grading work by that

date.  Instead, thinking that it had no reason to hurry, Greenbriar set about stockpiling suitable fill

material[9] to use at a later date.  When it learned sometime after November 2, 2001, that the

permit, which did not have an expiration date when issued, would expire on December 1,

Greenbriar had little time to finish the work that required additional fill material, the construction

and installation of pipe, and further grading work.  In reliance on a validly issued permit without

an expiration date, Greenbriar made substantial expenditures in obtaining fill material[10] and also

incurred substantial obligations under the NPDES/ADEM permit.[11]  Therefore, the court finds

that Greenbriar, in reliance on the land disturbance permit, made substantial expenditures and

incurred substantial obligations that would create a vested property interest *if* done in good faith.

The City correctly stated that the existence of a vested property right under equitable

principles requires that the plaintiff act in good faith.  (*See* City's Post Trial Br. p. 5, citing

*Haginas v. Haginas,* 598 So. 2d 1334, 1337 (Ala. 1992)).  The City then argued that Greenbriar

did not have a good faith belief that "it was vested with an undeprivable right to dump and

stockpile over 260,000 cubic yards of rock and dirt on its property over an unlimited period of

time, so that it might someday use the property for commercial purposes and contrary to what it

---

[9]As testified to at trial, the plaintiff has been properly selective as to the type of fill material it secures for this project.  It only seeks gravel material to reduce water runoff and to avoid pollution and other environmental concerns.  (Tr. pp. 6, 161-64, 207-214).  This type of fill material is not readily available, and the plaintiff had made arrangements with contractors who were excavating in certain projects nearby to unload this quality fill material on the property.  Only when this gravel-type fill is available at reasonable prices or free from contractors needing a place to get rid of excavated material has the plaintiff acquired fill for the property.  *Id.*

[10]In the summer of 1999, Greenbriar spent approximately $110,000 preparing the site to receive additional backfill material, which included clearing trees and brush, removing litter and other debris, and installing erosion control mechanisms.  (Saiia Aff. at ¶ 21).  Additionally, Greenbriar had obtained a substantial amount of fill material.  As a result of the revocation of the permit, Greenbriar has lost the opportunity to obtain the remaining amount of fill material needed to complete the project authorized by its land disturbance permit at a reduced cost.

[11]Under the NPDES permit, which is issued and administered by ADEM, Greenbriar is required to comply with numerous standards related to water runoff and other environmental concerns, including required monitoring of the subject property.  (Pl.'s Ex. 42).  As the court understands the testimony at trial, both the NPDES/ADEM permit and the land disturbance permit are required to conduct any land disturbing activity on its property.

was currently zoned," and that the City was not clearly informed of the intended use of the permit. (City's Post Trial Brief p. 6).

When Greenbriar applied for the land disturbance permit, everyone involved knew[12] that Greenbriar wanted to clear its land in anticipation of having the property rezoned for commercial use, even though the property was currently zoned residential; the permit stated on its face a purpose of "commercial use"; the application did not have the blank filled in regarding the length of time for the project; and the City, after having its attorney review the permit application, issued the permit without a time limitation.[13]

Nothing in the record reflects that Greenbriar acted in bad faith in requesting the permit. Greenbriar never attempted to mislead the City into thinking that Greenbriar requested the permit to prepare the land for a use consistent with the residential zoning. In fact, the permit issued by the City stated what everyone knew – that the purpose of the permit was to clear and grade the property for "commercial" use. (Pl. Ex. 1). Although the City probably did not anticipate that the grading of the property would continue for more than three years, the City's failure to specify a time limitation when issuing the permit does not impart to Greenbriar a lack of good faith. The

---

[12]As reflected previously, this parcel of property and various people involved with it are well known by the City officials. In view of the numerous contacts between representatives of both sides over the use of this property, the court finds that the City knew that the owners of the property had no intention of using the property for any residential purpose when the permit was requested. This knowledge can be inferred from the issuance of the permit as one for "commercial" use. (Pl.'s Ex. 1).

[13]The permit itself states:
[t]his permit issued subject to the party to whom it is issued fully complying with all requirements of the building code and all pertinent laws and ordinances of the City of Mountain Brook regulating the use and construction of structurals and the work authorized by this permit. Otherwise it shall become void and the party liable to such penalties as may be provided for violation of said ordinances.    This permit shall be void if not kept at approved location of work, if work is not commenced within 90 days or if work authorized by it is stopped for 90 days. (Pl.'s Ex. 1).

21

court, thus, finds that Greenbriar acted in good faith in securing the validly issued land disturbance permit.

For the reasons stated, the court finds that Greenbriar has vested property rights in its permit at issue here that spring from equitable principles. Having determined that Greenbriar possessed a vested property right in the continuation of its validly issued land disturbance permit, the court must examine whether any action by the City unconstitutionally deprived Greenbriar of that property right. The City, in its answer, acknowledged that Greenbriar cannot comply with the requirements of Ordinance 1485 to renew its land disturbance permit. (*See* Answer ¶ 20). The question to be examined, then, is whether the effective permanent revocation of that permit meets the requirements of constitutional protection.

### 2. City action

The doctrine of substantive due process embodied in the Fourteenth Amendment prohibits "'deprivation of a property interest for an improper motive and by means that were pretextual, arbitrary and capricious, and . . . without any rational basis.'" *Spence v. Zimmerman*, 873 F.2d 256, 258 (11th Cir. 1989) (quoting *Hearn v. City of Gainesville*, 688 F.2d 1328, 1332 (11th Cir. 1982)); *see also Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1577 (11th Cir. 1989). The plaintiff carries a heavy burden of proof because "zoning regulations will not be declared unconstitutional as violative of substantive due process unless they 'are clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare.' Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S. Ct. 114, 121, 71 L. Ed. 303 (1926)." *Greenbriar, Ltd. v. City of Alabaster*, 881 F.2d 1570, 1577 (11th Cir. 1989). To prevail, the plaintiff must establish that the City's action in revising the challenged code sections

22

"bore no substantial relation to the general welfare." *Greenbriar Ltd.*, 881 F.2d at 1577.

The rational basis test consists of a two-prong test:

> [t]he first step in determining whether legislation survives rational-basis scrutiny is identifying a legitimate government purpose–a goal– which the enacting government body *could* have been pursuing. The *actual* motivations of the enacting body are entirely irrelevant. . . . The second step of rational basis scrutiny asks whether a rational basis exists for the enacting governmental body to believe that the legislation would further the hypothesized purpose. The proper inquiry is concerned with the *existence* of a conceivably rational basis, not whether that basis was actually considered by the legislative body.

*Georgia Manufactured Hous. Ass'n, Inc. v. Spalding County*, 148 F.3d 1304, 1307 (11th Cir. 1998) (citing *Haves v. City of Miami*, 52 F.3d 918, 921-22 (11th Cir. 1995)) (emphasis in original). The determination of whether a land use decision was arbitrary and capricious and without a rational basis forms a question of law for the court to decide. *See Greenbriar, Ltd.*, 881 F.2d at 1578.

### a.    Ordinance 1485 In Its Entirety

Greenbriar contends that the City targeted it when revising the city code sections regarding land use. (*See, e.g.,* Compl. pp. 1, 16-19; Greenbriar's Post Trial Br. pp. 19-20). As previously stated, this court finds that Greenbriar's activities on its property and the City's desire to terminate these activities were the primary motivation behind Ordinance 1485, especially subsection (k). Granted, as a result of the revisions to the Code, particularly Ordinance Number 1485(k), the land disturbance permit issued to the plaintiff on March 18, 1998 was revoked effective December 1, 2001. The original permit failed to state a termination date. Plaintiff concedes in its brief that it did not expect the permit to last forever, and that a reasonable expiration date would be appropriate. (*See* Greenbriar's Post Trial Br. pp. 17, 19). The question

23

remains, however, whether the City's termination of that permit under these circumstances with approximately thirty days post-decision notice can pass constitutional muster.

The plaintiff contends that this case is most similar to *Wheeler v. City of Pleasant Grove*, 664 F.2d 99 (5th Cir. 1981), and urges this court to likewise find the City's actions to be a "bald attempt to revoke an already authorized . . . permit." *See* 664 F.2d at 100. In *Wheeler,* the plaintiffs were granted a permit to build an apartment complex under the city ordinance in effect at that time. 664 F.2d at 100. After "news of the construction of the apartment complex caused an uproar," the City passed a new ordinance that forbade the construction of new apartments, including the plaintiffs' project. 664 F.2d at 100. In affirming the district court's findings that the implementation of the new ordinance was arbitrary and capricious, the Fifth Circuit stated that it perceived the enactment of the new ordinance was " a bald attempt to revoke an already authorized building permit." 664 F.2d at 100.

The opinion in *Wheeler*, however, is distinguishable from the instant case because the enactment of Ordinance 1485 was not arbitrary and capricious, or without rational basis.  In *Wheeler,* the enactment of the ordinance revoking the plaintiffs' permit was apparently based solely on public outcry directed at the plaintiffs' project. *See Wheeler,* 664 F.2d at 100.  The City's decision in this case to enact Ordinance 1485, on the other hand, was not based solely on public outcry or solely on a desire to terminate Greenbriar's permit, but rather on a decision to clarify its zoning laws. Ordinance 1485 as a whole was designed to resolve ambiguities and to clarify the existing zoning code.  (Tr. pp. 372-77, 398, 407-12).  Indeed, the very terms of the

24

Ordinance outline the various purposes for which it was enacted.[14]

Even if the City's action constituted a response to the concerns of surrounding landowners, community reaction was not the sole reason for the City's action. The City had numerous legitimate reasons for the passage of Ordinance 1485 as a whole. Although Greenbriar produced some evidence that community concerns may have influenced the City's actions and the court finds that terminating Greenbriar's permit was one reason for the ordinance, nevertheless the plaintiff did not negate the conceivable legitimate rational bases that support the enactment of Ordinance 1485 as a whole. *See Bannum, Inc. v. City of Fort Lauderdale,* 157 F.3d 819, 823-24 (11th Cir. 1998).

Instead, the court finds that the reasoning in *Spence v. Zimmerman,* 873 F.2d 256 (11th Cir. 1989), is more closely analogous and more appropriately recognizes the balancing to be done between the rights of the individual landowner and those of the surrounding neighbors and the City. In *Spence,* the Eleventh Circuit affirmed summary judgment in favor of a city that had denied a temporary certificate of occupancy to the plaintiffs who had failed to complete construction of a residence under their building permit for more than six years. The Eleventh Circuit found that the city had legitimate concerns over the slow manner of construction. The court opined that "[t]he City could rationally care that a structure that was only half completed

---

[14]Ordinance Number 1485 states as its purpose the following:
WHEREAS, the City Council (the "City Council") of the City of Mountain Brook, Alabama (the "City") has determined that certain provisions of Chapter 4 of the Mountain Brook City Code may be ambiguous and desires to clarify them as provided below to assure orderly development within the city.
WHEREAS, to assure proper controls on development within the City, the City Council desires to provide time limitations for the validity of permits issued by the City expressly subject to the provisions of Chapter 4, as amended.
WHEREAS, the City Council has determined that it is in the best interest of the City to amend the provisions of Chapter 4 as set forth below to better protect the public health, safety, and welfare of the City and its residents. (Pl.'s Ex. 9).

after five years presented a problem with rodents, transients, sand erosion or vandals, injuring the surrounding neighborhood economically, environmentally, and aesthetically. Avoidance of such harms is a constitutionally permissible objective." 873 F.2d at 260. The Eleventh Circuit further stated that "the City could rationally interpret the [Building] Code to require that permitted construction must be substantially completed within a reasonable time of the permit's issuance." 873 F.2d at 260. Finally, the Eleventh Circuit found that "the conditions placed on continuation were not unrelated to land use planning, but were rationally related to the City's protection of its neighborhoods. . . . [I]t cannot be said[,] therefore[,] that the City was acting with an improper motive; nor was it acting arbitrarily, capriciously, or irrationally." 873 F.2d at 261.

Granted, the unusual actions of Greenbriar in pursuing a land disturbance permit to prepare its property for a use not allowed under the current zoning alerted City agents to the need to revise and refine the ordinances governing issuance of the land disturbance permit. Greenbriar makes much of the fact that Mr. Galloway, a City attorney, reviewed its application for the land disturbance permit, admittedly an unusual step. (*See* Tr. pp. 72-73). Greenbriar uses the fact that Mr. Galloway had never before reviewed a land disturbance permit application to support its argument that the City targeted Greenbriar for action. (*See, e.g.,* Greenbriar's Post Trial Submittal p. 3, fn.2).[15] However, Mr. Galloway's letter to Mr. DeBuys referenced the "unusual nature of this request." (Pl.'s Ex. 3). Indeed, the request was an unusual one: Greenbriar sought a permit to clear and grade its property to prepare the property for use as a commercial site when Greenbriar had repeatedly been denied its requests to change the zoning from

---

[15]Although the court agrees that the City targeted Greenbriar, as discussed *infra*, mere targeting alone provides insufficient grounds for a substantive due process violation when the action finds support in numerous rational reasons for its passage.

residential to commercial. In fact, Greenbriar's last request for a zoning change had been denied only two months before it requested a permit to allow it to prepare the property for a use that the City had just denied. (Ex. B to Saiia Aff.). Upon examination, the City attorney concluded that the Code did not expressly forbid issuance of a land disturbance permit even though the purpose was to prepare the property for a use not authorized by the zoning laws. (*See* Galloway Depo. pp.70-76; Pl.'s Ex. 3).

The court finds that the City had numerous rational bases for enacting Ordinance 1485 as a whole, and insufficient evidence exists to demonstrate that the Ordinance was enacted solely to target Greenbriar and was without any rational basis. As emphasized above, the Eleventh Circuit requires a plaintiff to show more than an improper motive for a substantive due process violation. The Eleventh Circuit stated that the plaintiff must demonstrate all of the following for the court to find a substantive due process violation: "'deprivation of a property interest for an improper motive **and** by means that were pretextual, arbitrary and capricious, **and** . . . without any rational basis.'" *Spence v. Zimmerman*, 873 F.2d 256, 258 (11ᵗʰ Cir. 1989) (emphasis added) (quoting *Hearn v. City of Gainesville,* 688 F.2d 1328, 1332 (11ᵗʰ Cir. 1982)). Thus, the test for substantive due process is conjunctive, not disjunctive. In short, a mere improper motive is insufficient to create a substantive due process violation when a conceivable rational basis exists. *See Georgia Manufactured Hous. Ass'n, Inc. v. Spalding County,* 148 F.3d 1304, 1307 (11ᵗʰ Cir. 1998).

Greenbriar failed to negate all possible reasonable bases for Ordinance 1485 as a whole. The court finds, for example, that Ordinance 1485 remedied many defects in the prior land disturbance ordinance. Although one could reasonably assume that a landowner should have to

27

obtain rezoning <u>before</u> being allowed to take steps toward preparing property for a use not allowed under the property's current zoning, the old ordinance did not clearly contain such a requirement. Also, the previous ordinance did not mandate a maximum time allowable for land disturbance work under the permit. Correcting these omissions represents legitimate concerns of the City. Because the City has a legitimate interest in avoiding adverse consequences that could result under the prior ordinance, the City had a legitimate reason for addressing these defects. *See Corn v. City of Lauderdale Lakes*, 997 F.2d 1369, 1375 (11th Cir. 1993); *Greenbriar, Ltd. v. City of Alabaster,* 881 F.2d at 1579-80; *Spence v. Zimmerman,* 873 F.2d at 260.

In *Corn v. City of Lauderdale Lakes*, 997 F.2d 1369 (11th Cir. 1993), the Eleventh Circuit outlined several legitimate government concerns regarding land use laws. Among those concerns that are potentially applicable here are the effect of the proposed development on traffic, congestion, surrounding property values, and demand for city services; the cumulative effect of economic, environmental, and aesthetic harms; interference with the blessings of quiet seclusion; protection against the ill effects of urbanization; the exclusion of industry from residential areas; and the regulation of traffic, noise, and litter. 997 F.2d at 1375. The court noted that these examples are not exclusive, stating "'[i]t is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled.'" 997 F.2d at 1375 (quoting *Berman v. Parker*, 348 U.S. 26, 33 (1954)). These interests support the City's revisions of its land disturbance provisions, including Ordinance 1485.

Greenbriar relies on the nature and length of the dispute over its use of its land and the animosity of the surrounding neighbors to support its contention that the revision of the City

28

Code was "targeted" at its property.  As the Eleventh Circuit noted in *Greenbriar, Ltd.*,

> [h]owever, a planning commission or a City Council is not a judicial forum; it is a
> legislative body held democratically accountable through precisely the forms of
> political suasion to which Greenbriar objects . . . .  Council members who
> evaluate a proposal in light of their constituents' preferences do not necessarily
> overlook what Greenbriar contends to be the "merits" of a particular zoning plan
> . . . Here, there is no indication that Council members' attention to citizens'
> concerns in assessing Greenbriar's zoning plan deprived their decision of a
> rational basis.

881 F.2d at 1579.  Although made in the context of a denial of a request to rezone property,

these observations play equally well in this case.  The honest motive of improving the land use

sections of the city code by tighter drafting to accomplish an implicit goal of uniformity in use

that was lacking in the prior provisions justifies the City's actions.  Further, responding to the

concerns of its citizens that the plaintiff was doing grading and fill work on its property over an

extended period of time for an acknowledged end that did not comply with the current zoning of

that property was an appropriate governmental interest of City officials.  *See Greenbriar Ltd.*,

881 F.2d at 1579.

The court, therefore, concludes that the enactment of Ordinance 1485 did not violate

substantive due process protections because the City had numerous reasonable bases for its

adoption. The court also finds that a rational basis exists for the City to believe that enacting

Ordinance 1485 would further these purposes.  *See Georgia Manufactured Hous.*, 148 F.3d at

1307.  The plaintiff failed to meet its heavy burden of establishing that the City's action deprived

it "'of a property interest for an improper motive and by means that were pretextual, arbitrary and

capricious, and . . . without any rational basis.'"  *Spence*, 873 F.2d at 258 (citations omitted).

**b.      Subsection (k)**

The court, however, specifically finds that, based on the facts as a whole, the City directly

targeted Greenbriar in subsection (k) of Ordinance 1485.  The evidence at trial indicated that the

City meant to accomplish through subsection (k) what Judge Vowell previously precluded it

from doing - - stopping Greenbriar's land disturbance work.  Accordingly, this subsection must

be evaluated apart from the remaining provisions of Ordinance 1485.

Subsection (k)[16] terminates all permits issued before July 12, 1999, within thirty days of

the effective date of Ordinance 1485.  Under the terms of subsection (k), the expiration date on

permits falling within this provision could be extended <u>if</u> the work being done under the permit

complies with all other regulations.

The same analysis for evaluating a substantive due process violation used above applies

equally to subsection (k).  The improper motive of the City in enacting subsection (k) of

Ordinance 1485 does not necessarily indicate a substantive due process violation.  Unless

Greenbriar can demonstrate that no conceivable rational basis for subsection (k) existed, the

---

[16]Subsection (k), in pertinent part, reads:

(k) The following sections are hereby added to Chapter 4, Article IV, Division 2 immediately
following Section 4-54:

"Sec. 4-55.  Permits issued prior to July 12, 1999.

All permits issued under this article prior to July 12, 1999 (the effective date of the Soil Erosion
and Sediment Control Ordinance of the City of Mountain Brook), shall expire within thirty (30)
days of the effective date hereof.  The official shall give notice of such expiration to all holders of
such permits within ten (10) days of the effective date hereof.  The official may, however, upon
good cause shown, extend the expiration date of such permits, <u>provided that the work shall comply
with all of the requirements of this chapter and other applicable laws and regulations in effect at
the time application for extension is made</u>." (emphasis added).

30

subsection must be upheld. This Greenbriar cannot do. The court finds that, like the facts

previously described from *Wheeler,* the City targeted Greenbriar by enacting Ordinance 1485(k).

*See Wheeler v. City of Pleasant Grove*, 664 F.2d 99 (11th Cir. 1981) (finding substantive due

process violation after a city enacted a permit-revoking ordinance based solely on public outcry).

However, unlike *Wheeler,* the City had numerous other conceivable rational bases for enacting

subsection (k).

For example, under the old ordinance then, theoretically, a landowner in the middle of a

residential subdivision could obtain a land disturbance permit; clear all trees from the property;

fill and grade the property in preparation of a desired commercial use; bring dump trucks and

grading equipment into the residential area with attendant dust and destruction of pavement for

an unlimited number of years; and have the property remain in a barren, hideous state for years or

even decades pending rezoning to commercial use that may never come. In the meantime, the

value of surrounding residential property would decline, and the aesthetics of the tranquil

residential area would be destroyed. The concept of public welfare, a legitimate governmental

interest, extends to the blessings of peace and quiet and clean air, as well as concern about

maintaining property values. *See Spence*, 873 F.2d at 260 (quoting *Village of Belle Terre v.

Boraas*, 416 U.S. 1, 9, 94 S. Ct. 1536, 1541, 39 L. Ed. 2d 797 (1974); citing *City of Lewiston v.

Knieriem*, 107 Idaho 80, 685 P.2d 821 (1984)). All these interests were at risk if subsection (k)

had not set an expiration date for previously-issued permits because of the continued activities of

Greenbriar on its property with no end in sight. "Avoidance of such harms is a constitutionally

permissible objective." *Spence*, 873 F.2d at 260. As in *Spence*, the City of Mountain Brook

"could rationally conclude that the [land use] code did not intend for a [land disturbance] permit,

31

once issued, to continue indefinitely.  Even though there was no time limit expressed, the City
could rationally interpret the Code to require that permitted [land disturbance] must be
substantially completed within a reasonable time of the permit's issuance." *Spence*, 873 F.2d at
260.

Even if the court were to conclude that the land disturbance permit vested in the plaintiff
a right to grade and clear the land, and stockpile fill material on it *for an indefinite time*, the
plaintiff has failed to show an abuse of government power in modifying its ordinances to provide
for a required time limitation on such permits, seeking to limit such permits to work done in
anticipation of a legal use of the property, and seeking to terminate prior permits not in
accordance with the new provisions.  As recognized by the Eleventh Circuit Court of Appeals in
*Spence*, city building permits need not extend forever.  873 F.2d at 260.  The same is true for
land disturbance permits.  When the City issued Greenbriar its land disturbance permit on March
18, 1998, even though the permit left blank the expiration date, the City could not reasonably
have believed that the work of clearing, grading, and filling would still be continuing more than
three years later with no end in sight.  (*See* Tr. p. 133).  The amount of the original bond, only
$10,000, did not indicate the magnitude of the work actually done to date by Greenbriar.
Understandably, the surrounding neighbors have been upset by the effects of the plaintiff's
activities on the enjoyment of their surrounding properties and have complained to various city
officials. [17]  Also, Greenbriar acknowledged that its permit is subject to some reasonable time
limitation and has further admitted to the court that, in general, a two-year time limit on land

---

[17] At trial, the court took judicial notice of the sometimes heated nature of the dispute between Greenbriar
and surrounding neighbors as reflected in numerous newspaper accounts over several years about activities on the
property.

32

disturbance permits is reasonable. (*See, e.g.,* Greenbriar's Reply to the City's Post-Trial Brief at p. vii).

After listening to two days of testimony and reviewing submissions of deposition testimony, as well as the lengthy submissions of counsel, the court is not convinced that the plaintiff produced sufficient credible evidence that the City acted with an improper motive <u>and</u> acted arbitrarily or capriciously <u>and</u> without a rational basis for its actions in passing Ordinance 1485, even subsection (k). The court concludes that the actions of the City in revising its ordinances, even subsection (k), to achieve a more uniform approach to land use was not such an abuse of governmental power as to raise the effect of those actions upon the plaintiff to the level of a constitutional violation. *See Spence v. Zimmerman*, 873 F.2d at 260. Accordingly, the court finds that subsection (k) withstands constitutional scrutiny for substantive due process.

### B. Procedural Due Process

Having concluded that all sections of Ordinance 1485 withstand substantive due process attack, the court next must examine plaintiff's procedural due process challenges. The plaintiff also alleges that the City deprived it of procedural due process by failing to give it notice before enacting Ordinance 1485 and effectively terminating its permit. "The Due Process Clause of the Fifth Amendment prohibits the United States, as the Due Process Clause of the Fourteenth Amendment prohibits the states, from depriving any person of property 'without due process of law.' From these 'cryptic and abstract words,' *Mullane* [*v. Central Hanover Bank & Trust Co.,* 339 U.S. 306] at 313, 70 S. Ct. 652, we have determined that individuals whose property interests are at stake are entitled to 'notice and an opportunity to be heard.' *United States v. James Daniel Good Real Prop.,* 510 U.S. 43, 48, 114 S. Ct. 492, 126 L. Ed. 2d 490 (1993)."

33

*Dusenbery v. United States*, 534 U.S. 161, 122 S. Ct. 694, 699, 151 L. Ed 2d 597, 604 (2002).

Both parties initially argued that *Mullane* stated the appropriate standard. Only after the court held a conference to try to get the parties to settle some issues and indicated it believed a procedural due process violation had occurred did the defendant argue that a different legal standard applied. The court allowed supplemental post-trial briefing on the issue raised by the defendant; that is, whether the enactment of Ordinance 1485 was a legislative act, which does not require pre-enactment notice or an opportunity to be heard. The court finds that this new argument does not apply to the facts of this case, and the City violated procedural due process by not providing pre-deprivation notice to Greenbriar as a part of the enactment of Ordinance 1485. Specifically, the court finds that *Mullane*, as originally argued by the parties, provides the proper standard for evaluating procedural due process in the context of this case.

The City argued that the enactment of Ordinance 1485 was a legislative act and, therefore, did not require the City to be provide Greenbriar with notice and an opportunity to be heard prior to enactment. (City's Supp. Post-Trial Br. at p.1). Essentially, the City reasoned that Greenbriar was not entitled to personal notice of the consideration and ultimate enactment of Ordinance 1485 because the ordinance equally affected all those similarly situated, provided sufficient due process by virtue of its legislative nature, and did not serve as an adjudication of Greenbriar's property right. *See id.* In its post-trial supplemental brief, the City cited numerous cases emphasizing the minimal due process requirements for legislative acts of general applicability. *See id.* at pp.1-6. The City then distinguished *Mullane* for the first time in this case, citing the United States Supreme Court's opinion in *Texaco v. Short*, 454 U.S. 516 (1982).

The City classified Ordinance 1485 as a legislative act, arguing the general proposition

that local laws or ordinances are normally treated as legislative in nature.  (City's Post-Trial Br.

at pp. 9-14).  Notably, the City argued that "Ordinance 1485, as a whole, is comprised of many

provisions of general applicability that are prospective."  *Id.* at 10.  Finally, the City distinguished

the cases on which Greenbriar relied as inapplicable to legislative acts, emphasizing that

Ordinance 1485 did not become adjudicative (and therefore subject to procedural due process

requirements) simply because it caused Greenbriar's permit to expire.  *Id.*

In response, Greenbriar argued that Ordinance 1485 is not a legislative act because it is

not a law of general applicability, nor is it prospective.  (Greenbriar's Reply to City's Supp. Br. at

p. 1).  Greenbriar urged the applicability of *Londoner v. Denver,* 210 U.S. 373 (1905), rather than

*Bi-Metallic Investment Co. v. State Bd. of Equalization*, 239 U.S. 441 (1915), as the City

contended.  Greenbriar distinguished the holdings in *Londner* and *Bi-Metallic* and outlined the

progenies of each case.  In short, Greenbriar argued that the Supreme Court's enunciation of a

legislative exception in *Bi-Metallic* applies only to laws of general, prospective application.

(Greenbriar's Reply to the City's Supp. Br. at p. 2).  Greenbriar further argued that *Londner*

controls the facts of the instant case because that holding  applies to city ordinances that affect a

small number of landowners in an individual and exceptional way.  *Id.* at 7-8.

In *Londer,* the Supreme Court held that a city council that adopted a special tax

assessment without providing a hearing to small group of individuals who were exceptionally

affected by the assessment violated procedural due process.  *See* 210 U.S. 373, 385-86.  Later,

the Supreme Court carved out a legislative exception for laws of general applicability in *Bi-

Metallic.*  239 U.S. 441, 445-46.  In *Bi-Metallic,* the Court distinguished its earlier opinion in

*Londner,* characterizing *Londner* as requiring procedural due process for "[a] relatively small

number of persons . . . who were exceptionally affected, in each case upon individual grounds." *Id.* at 446. The court agrees that *Londner* more closely applies to the facts of this case.

Greenbriar asserted that the reason due process does not attach to laws of general applicability is because requiring  individual notice to all citizens equally affected by a law in the present and the future would be too burdensome for legislators. (Greenbriar's Reply to City's Post-Trial Br. at p. 3). Greenbriar focused its argument on subsection (k) of Ordinance 1485, asserting that it is neither general nor prospective, as it applied to only eight permit holders and was retroactive in nature. *Id.* at pp.6-7. Therefore, Greenbriar argued, the reason behind the rule did not apply in this case. Finally, Greenbriar asserted that *Mullane* is the proper standard to be applied to the procedural due process challenge in this case.

The court agrees with Greenbriar's analysis. The ordinance at issue here does not apply prospectively and equally to all landowners or permit holders in Mountain Brook. As the court has already found, Mountain Brook targeted Greenbriar's permit when it adopted Ordinance 1485. As to Greenbriar, and Greenbriar alone, the provisions of Ordinance 1485 work together to permanently revoke Greenbriar's permit. As to Greenbriar, and Greenbriar alone, the ordinance operated retroactively to terminate the permit as well as prospectively to bar its renewal. As to Greenbriar, the effect of Ordinance 1485 operates the same as an administrative adjudication revoking the permit. Judge Vowell had already instructed the city that it could not, by administrative order, terminate Greenbriar's rights to operate within the scope of its valid permit. *See Greenbriar Village, L.L.C. v. City of Mountain Brook,* Case Number CV-00-3720-JSV. The City then sought to do legislatively what it had been precluded from doing administratively - - terminate Greenbriar's land disturbance permit. The City, in brief, conceded

that an administrative act that adjudicates property rights requires pre-deprivation notice. (*See* Def.'s Supp. Post-Trial Br. at p. 5, 8, 13). The court finds that the same notice requirement applies in this case only as to Greenbriar because the City attempted to accomplish the same result legislatively that it had been precluded from doing administratively.

Requiring that the City give notice and an opportunity to be heard to Greenbriar under the precise facts of this case does not violate the reasons supporting the general rule that notice is not required for legislative acts.  In the ordinary situation, giving notice to all persons who may be affected immediately or in the future by a legislative act could be unduly burdensome.  No such undue burden was involved in this case under the facts.

Unlike the cases cited by the City, in this situation, the heaviest burden of Ordinance 1485 fell on one landowner - - Greenbriar.  That landowner and the precise adverse, permanent effect of Ordinance 1485 to that landowner were well known to the City.  As already discussed, the City enacted Ordinance 1485 at least in part to address the specific concerns the City had about Greenbriar's use of its permit.  The City knew that, of all the landowners and permit holders who might be affected by the permit, the ordinance would permanently revoke Greenbriar's permit and that it would have no recourse to protect its vested property rights without court action.  The court does not infer or impute this knowledge to the City but finds actual, not constructive, knowledge because of the peculiar facts of this case and the nature of the parties' relationship with each other. Because the City had specific knowledge that its carefully crafted ordinance would result in dire detriment to one permit holder - - the specific permit holder whose actions instigated the drafting of the ordinance - - the court finds that the City owed

37

Greenbriar due process before termination of its property interest.[18]

Because the court has found that Greenbriar had a property right to be protected and that Greenbriar was entitled to due process, the court must look to whether the process afforded to Greenbriar withstands constitutional scrutiny. The court further finds that *Mullane* establishes the appropriate process due in this case. That process requires notice and an opportunity to be heard. *Dusenberry*, 122 S. Ct. at 699, citing *Mullane*.

The Supreme Court in *Dusenbery* confirmed that the appropriate test to determine the constitutional sufficiency of notice is whether the method of notice was "'reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.' [*Mullane*, 339 U.S.] at 314, 319, 70 S. Ct. 652; *see also id.* at 315, 70 S. Ct. 562 ('The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.')" *Dusenbery,* 122 S. Ct. at 700, 151 L. Ed. 2d at 605 (2002). Thus, the question for this court becomes whether the August 30, 2001, letter sent to Saiia Construction Co. was "reasonably calculated under all the circumstances" to notify Greenbriar of the pending ordinance amendment that would terminate its property interest in the land disturbance permit.

The City contends that it sent notice to Saiia Construction Co. as the "holder" of the permit, i.e as the contractor and company doing the work under the permit. (Tr. p. 85). The

---

[18] The holding on this point in this case is limited to the peculiar facts of this case. This opinion should not be read as a general pronouncement that legislative bodies need to give notice of proposed legislation to all entities whose property interests might be affected by the legislation. This court's ruling is much more narrow and is limited to the situation at hand where the City targeted Greenbriar in drafting the ordinance; the ordinance's devestating effect did not apply equally to all landowners or even to all permit holders; the ordinance affected Greenbriar retroactively and permanently and affected no other entity in such fashion; and the City knew the detrimental effect of the ordinance on the one permit holder that the ordinance specifically targeted.

permit, however, was issued to Greenbriar Village, L.L.C.  (Pl.'s Ex. 1).  The only mention of Saiia Construction Co. appears, not on the permit, but on the increased bond issued in November 2001 where Saiia Construction, LLC was listed as the principal on the bond, but no address appeared for it. (Def.'s Ex. 7).  As previously stated, the court finds that the City knew how to contact Greenbriar if it had wanted to do so.  In fact, the City actually had to go out of its way to get an address for non-owner Saiia Construction.

In this case,  giving notice to the most affected landowner prior to the passage of the ordinance was particularly important so that the landowner whose vested property interest would be permanently terminated might have the opportunity to challenge the proposed changes. Providing notice to the principal on the bond was insufficient as to Greenbriar because once the ordinance was enacted, Greenbriar's permit could not be renewed. Unlike the other landowners who had land disturbance permits that were affected by Ordinance 1485, Greenbriar could not qualify to renew its permit.  Subsection (k) required that an extension of an expiration date could be considered only if the work complied with all the requirements of regulations in effect when the extension request is made.  Ordinance 1485 required that work under a land disturbance permit be done "in anticipation of" a use allowed under the current zoning.  Greenbriar never intended to prepare the property for any use allowed under the current residential zoning, so it could not honestly apply to renew its permit under Ordinance 1485.  (*See* Tr. p. 345). Additionally, the court finds particularly important the fact that Ordinance 1485(k) permanently affected only Greenbriar and no other landowners.

Also, City officials discussed the idea of sending notice to the landowners, but they did not do so, despite the fact that notice to the owners would have been easy to accomplish.  The

39

City does not contend, except in a footnote in its supplemental post-trial brief, that notice to Saiia Construction Co. served as notice to the owners. The court finds unpersuasive the City's argument that because Saiia Construction was listed as the principal on the bond securing the permit, notice to Saiia Construction was sufficient.[19] No owners of Greenbriar saw the August 30, 2001, letter until after the filing of this lawsuit. (Tr. p. 153). Notice to the principal on the bond does not appear to be the method of notification that would be used if the City were "desirous of actually informing" Greenbriar that its permit was about to be permanently terminated. *See Dusenbery,* 122 S. Ct. at 700.

The City argued that its November 2, 2001, letter to Mr. De Buys, which notified Greenbriar that its permit had expired, was sufficient notice. That letter also recited that "to afford Greenbriar ample opportunity to review the ordinance [1485] and to take appropriate action thereunder, enforcement of the ordinance as amended will be deferred until December 1, 2001." However, this notice was given after the fact of the action that permanently terminated Greenbriar's vested property interest in the permit. The harm occurred when the City passed Ordinance 1485 and effectively precluded Greenbriar from renewing its permit because its work on the property was not "in anticipation of" residential use, as required by Ordinance 1485. After the City Council adopted Ordinance 1485, Greenbriar had no opportunity to be heard and present its objections to the proposal, or to seek an amendment to the ordinance as to the effect it would have on existing permits. After the November 2, 2001 letter, the only appropriate action

---

[19]The mere fortuity that the president of Saiia Construction was also a principal of Greenbriar, L.L.C., does not negate the insufficiency of the notice. Had notice been sent to BEC/Allwaste, Inc., which was originally doing the work and was listed on the original application and permit, or any contractor unrelated to Greenbriar, such notice would not have been sufficient to notify Greenbriar of the impending vote on Ordinance 1485.

Greenbriar could take upon review of the ordinance was to cease its work by December 1, 2001,

and seek redress of the deprivation of its property rights in court.  When Ordinance 1485 was

enacted, Greenbriar's vested rights were stripped away and any "notice" thereafter was

insufficient to satisfy due process.  *See Zinermon v. Burch,* 494 U.S. 113, 127-28 (1990).  The

court notes that Ordinance 1485 worked as a whole to deprive Greenbriar of its property right by

mandating the permit's termination in subsection (k), as well as precluding renewal of the permit

through the remaining terms of the ordinance.

     Although due process does not require "actual notice," defined as "receipt of notice," the

method chosen to give notice to the affected party  must itself be "'reasonably certain to inform

those affected.' *Mullane,* 339 U.S. at 315, 70 S. Ct. 652." *Dusenbery*, 122 S. Ct. at 701, 151 L.

Ed. 2d at 606.  Although most cases examining due process evaluate the difficulty of giving

actual notice, the circumstances here are far different.  Here, the City had repeated, direct

contacts with the property owner.  In the past, all other notices and correspondence affecting

Greenbriar had been sent to Mr. De Buys at his business address.  Notably, the City sent the

November 2, 2001, letter notifying Greenbriar that its permit was revoked pursuant to Ordinance

1485 to Mr. DeBuys.

     The City does not contend that giving notice to Greenbriar would have been difficult,

burdensome, or otherwise unreasonable.  In short, the City would have suffered no undue burden

or major expense in notifying Greenbriar directly.  Rather, notice to the property owners would

have entailed a simple search for zip codes from property records or some other readily-available

source.  (*See* Pl.'s Ex. 39; Tr. p. 82).  Given the repeated involvement by City officials with

Greenbriar, the court doubts that much effort at all would have been necessary to send notice to

Greenbriar as the City had always done– by sending it to Mr. De Buys.

The City contends alternatively that its notice given by posting that Ordinance 1485 was

being considered for passage at the September 10, 2001, City Council meeting was sufficient

notice. (City's Post Trial Brief p. 13). For legislation that was of general applicability and

prospective, such notice would have been sufficient. However, the court does not find this

argument persuasive under the particular facts of this case as discussed above that support the

court's conclusion that the City targeted Greenbriar.

The case of *Walker v. City of Hutchinson*, 352 U.S. 112 (1956), involved a challenge by a

landowner to notice by the City of condemnation proceedings. The Supreme Court held that

notice to the landowner by publication failed to satisfy due process requirements. The Court

noted that the court in *Mullane* had

> emphasized the advantage of some kind of personal notice to interested parties. In
> the present case, there seems to be no compelling or even persuasive reasons why
> such direct notice cannot be given. Appellant's name was known to the city and
> was on the official records. Even a letter would have apprised him that his
> property was about to be taken and that he must appear if he wanted to be heard as
> to its value.

352 U.S. at 116 (footnote omitted).

Likewise, the City of Mountain Brook knew the name of the owner of the property most

affected by Ordinance Number 1485, knew that subsection (k) would forever terminate

Greenbriar's permit, and knew the address of its principals. The City presented "no compelling

or even persuasive reasons" why it could not have given direct notice to Greenbriar. Sending a

letter to Mr. De Buys, as it did on numerous other occasions, would have been a simple

procedure. Such a letter directly to this owner would have been "reasonably calculated under all

42

the circumstances" to give Greenbriar adequate notice of the hearing on the proposed ordinance and an opportunity to be heard. Because the City could easily have sent the notice of the proposed ordinance directly to the owner of the most detrimentally affected property, as it did on many other occasions, the method chosen for giving notice on this occasion does not appear to be the method one would choose if "desirous of actually informing" the affected landowner. *See Mullane,* 339 U.S. at 315. The court, therefore, concludes that notice of the hearing on the proposed ordinance that effectively and permanently revoked Greenbriar's permit was not "reasonably calculated, under all the circumstances to apprise [Greenbriar] of the pendency of the action and afford [it] an [opportunity] to present [its] objections." *See Mullane,* 339 U.S. at 314.

Even though the actions by the City in revising the land use code were not arbitrary or capricious so as to violate Greenbriar's substantive due process rights, the actions do not completely pass constitutional muster. As discussed above, procedural due process requires that landowners be given notice and an opportunity to be heard before property rights are affected. In short, the August 30, 2001 letter was insufficient because it was sent to the wrong party; the public notice was insufficient because direct notice easily could have been given to the most affected and targeted party; and the letter sent after the fact was insufficient because it came too late in time. Even if one of these methods of notice had been sufficient, the notice did not give the plaintiff an effective opportunity to be heard before the City took adverse action to revoke its land disturbance permit. Therefore, the court concludes that the action by the City deprived Greenbriar of its property interest in the permit without procedural due process.

By holding that the City owed Greenbriar direct notice of its intended action under the particular facts of this case, the court is not holding that the City must give direct notice to all

43

property owners of proposed ordinances that may affect their property interests. The facts of this case make it unique – or the court hopes that it is unique. When the City drafted Ordinance 1485 motivated at least in part by its desire to terminate Greenbriar's land disturbance permit, which had been validly issued to Greenbriar and created a vested property interest, and when the City knew that subsection (k) would permanently terminate Greenbriar's permit and that Greenbriar would be unable to renew that permit, unlike other affected landowners, it owed Greenbriar direct notice as required by due process. No other permit holders were directly targeted or permanently deprived of their vested property interest; therefore, the court does not find that the City owed direct notice to all affected permit holders–only Greenbriar. The failure to provide Greenbriar with procedural due process precludes the City from terminating Greenbriar's permit under Ordinance 1485.

### C. Equal Protection

Greenbriar also contends that the actions by the City violated the equal protection afforded it by the Fourteenth Amendment. In particular, Greenbriar asserts three separate violations of the Equal Protection Clause: facially, as applied, and on the basis of selective treatment.

The United States Supreme Court recently articulated that

the purpose of the equal protection clause of the Fourteenth Amendment is to secure every person within the state's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute, or by its improper execution through duly constituted agents.

*Village of Willowbrook v. Olech,* 528 U.S. 562, 564 (2000). According to the Eleventh Circuit, "[a]n equal protection claim revolves around whether similarly situated persons are treated

44

differently. *See City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3257, 87 L. Ed. 2d 313 (1985)." *The Reserve, LTD. v. Town of Longboat Key*, 17 F.3d 1374, 1381 (11th Cir. 1994).

 In *Spence v. Zimmerman*, discussed in detail above regarding substantive due process, the Eleventh Circuit noted that "[t]he equal protection clause 'is essentially a direction that all persons similarly situated should be treated alike.' *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439, 105 S. Ct. 3249, 3254, 87 L. Ed. 2d 313 (1985)." 873 F.2d at 261. Applying this general principle to the facts in *Spence*, which involved the denial of a temporary certificate of occupancy following a prolonged construction period, the Eleventh Circuit found that the plaintiffs "[had] shown no one similarly situated who has been treated more favorably. No other single family-lot owner had spent six years constructing a bare shell that was unfit to live in, yet demanded the right to live in it and build it around him at his convenience." *Spence*, 873 F.2d at 261. Because the plaintiffs could not demonstrate that they were in the same position as other persons who obtained the temporary certificates of occupancy, the court found they had "thus completely failed to show how the City's denial of the TCO deprived them of equal protection under the law." 873 F.2d at 262.

 The plaintiff here, like the plaintiffs in *Spence*, has failed to establish that it was treated differently than others similarly situated because no one else was similarly situated. No other holders of land disturbance permits who were affected by Ordinance 1485 were taking action on their property in anticipation of a non-conforming use of the property, and therefore could not renew their permits if unable to complete the work within the thirty-day expiration period.

 The plaintiff has failed to show how the passage of Ordinance 1485 deprived it of equal

protection under the law, facially or as applied.  As to its facial challenge, Greenbriar asserts that

Ordinance 1485 classifies Greenbriar in a discriminatory fashion by the use of the "in

anticipation" language.  On its face, however, this language does not classify Greenbriar for

different treatment.  Rather, all of the permit holders or those seeking permits in the future must

meet the same requirements.

Greenbriar asserted an alternative facial challenge to Ordinance 1485, arguing that it

"discriminates against *all* landowners who intend to disturb vacant property when he or she may

want to change future use." (Greenbriar's Post Trial Submittal p. 9). To the extent Ordinance

1485 makes such a classification, it is rationally related to the legitimate government purposes

outlined above.[20]

Although a closer question, the court finds that Greenbriar's challenge to Ordinance 1485

as applied to it similarly lacks merit because, as noted above, Greenbriar was not similarly

situated with others, and also, the City's application of the Ordinance to Greenbriar was identical

to the City's application to other landowners affected by the Ordinance.  True, Greenbriar was

more severely affected by the Ordinance.  However, to sustain its unequal application challenge,

Greenbriar must demonstrate that it "has been intentionally treated differently from others

similarly situated **and** that there is no rational basis for the difference in treatment." *Village of*

*Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S. Ct. 1073, 1074, 145 L. Ed 2d 1060, 1063

(2000) (emphasis added); *Williams v. Pryor*, 240 F.3d 944, 951 (11th Cir. 2001).  As the Eleventh

---

[20]The two-prong rational basis test is identical to that applied in the substantive due process context. *Georgia Manufactured Hous. Ass'n, Inc. v. Spalding County,* 148 F.3d 1304, 1307 ("[T]he substantive due process and equal protection claims both turn on the rational basis test; specifically, the [legislation] must be rationally related to a legitimate government purpose.").

Circuit stated "[d]ifferent treatment of dissimilarly situated persons does not violate the Equal Protection Clause." *E & T Realty v. Strickland*, 803 F.2d 1107, 1109 (11th Cir. 1987).

The plaintiff argues that it is a "class of one," as recognized in the *Olech* case. Even assuming that Greenbriar could show it is a class of one that has been treated differently than others similarly situated, Greenbriar's own actions placed it in that class of one. As elaborated previously, Greenbriar knew when it applied for a land disturbance permit in anticipation of a non-conforming use that it took the risk that the property would never be rezoned for commercial use. The court found no evidence presented at trial that even suggested that any other landowner had been so bold as to seek a land disturbance permit to prepare property for a particular use before having the property rezoned for that use.

Further, the court finds that any difference in treatment is rationally related to a legitimate government purpose, including protecting the interests of nearby landowners in the quiet enjoyment of their property, among others. As set forth in greater detail above, the court finds that the City enacted Ordinance 1485 for any number of legitimate government purposes, and the City had every reason to believe that the terms of Ordinance 1485 would further these purposes. Thus, a rational basis exists for any purported dissimilar treatment of Greenbriar.

The court also refuses to accept Greenbriar's selective treatment claims based on the reasoning in *LaTrieste Restaurant & Cabaret, Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994). The Second Circuit held in that case, which is merely persuasive authority and not binding on this court, that a claim for selective treatment in violation of equal protection requires a showing that "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as

47

race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." 40 F.3d at 590. The court finds that *LaTrieste* does not state the correct standard. Even if it did, the plaintiff would not succeed under that test.

The court finds that, as discussed above, Greenbriar is not similarly situated with others. Further, even if Greenbriar were similarly situated to other permit holders, the court finds that Greenbriar was not selectively treated. Finally, even if Greenbriar could establish the first element of its selective treatment claim, it cannot prevail on the second element because it failed to produce credible evidence of impermissible considerations, maliciousness, bad faith, or animus on the part of the City that outweighed the legitimate reasons for enacting or enforcing Ordinance 1485.

For the reasons stated, Greenbriar failed to establish its equal protection claims.

## IV.    Conclusion

Because the City failed to give Greenbriar timely and effective notice of the proposed Ordinance 1485, specifically subsection (k), that effectively abolished Greenbriar's rights under the validly-issued permit, the City deprived Greenbriar of its vested property interest in the land disturbance permit in violation of procedural due process, resulting in irreparable injury to Greenbriar. Unless the court enjoins the enforcement of Ordinance 1485 against Greenbriar, the irreparable injury will continue, and Greenbriar has no adequate remedy at law to redress such deprivation of Greenbriar's due process rights. Therefore, Greenbriar is entitled to permanent injunctive relief.

The court cautions that the City will only be enjoined from enforcing Ordinance 1485 against Greenbriar. The City is enjoined from applying Ordinance 1485 to terminate

48

Greenbriar's vested property rights under the 1998 permit.  This injunction also precludes the City from using Ordinance 1485 to curtail the scope of the plaintiff's permit, work to be performed, or the time period within which Greenbriar can conduct its clearing and grading work.

DONE and ORDERED this 20th day of May, 2002.

KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE